UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

4699 INVESTMENT CORP.,	CASE NO: 1:22-CV-23272-DPG

    Plaintiff,

v.

MARATHON PETROLEUM COMPANY, LP,

    Defendant.
_____/

## SECOND AMENDED COMPLAINT

Plaintiff, 4699 INVESTMENT CORP. ("**Plaintiff**" or "**Investment Corp**"), by and through its undersigned counsel, files this action against Defendant, MARATHON PETROLEUM COMPANY, LP ("**Defendant**" or "**Marathon**"), and alleges:

### Jurisdiction, Venue and Parties:

1. This is a civil action for declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, violation of the Petroleum Marketing Practices Act, and tortious interference with a business relationship.

2. Plaintiff is a Florida corporation with its principal place of business in Miami-Dade County, Florida. Accordingly, Plaintiff is a citizen of Florida.

3. Defendant is a Delaware limited partnership comprised of three partners: Marathon Petroleum Corporation, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Ohio; general partner MPC Investment LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business located in the State of Ohio; and Giant Industries, Inc., a corporation organized and existing under the laws of the State of Delaware with its principal place of business

1

in the State of Ohio. MPC Investment LLC's sole member is Marathon Petroleum Corporation. Accordingly, Marathon is a citizen of both Delaware and Ohio. (Notice of Removal ¶ 10; Counterclaim ¶ 9).

4. The amount in controversy in this action exceeds $75,000.

5. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

6. Venue is proper in the Southern District of Florida because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, and the property that is the subject of the action is situated here. 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

**A. Investment Corp's Acquisition and Operation of the Property.**

7. In or about April 2022, Investment Corp negotiated for the purchase of the property located at 4699 NW 183rd Street, Miami Gardens, FL 33055 (the "**Property**").

8. On or about July 25, 2022, the transaction closed and Investment Corp became the owner of the Property.

9. The Property is subject to a deed restriction by and between BP PRODUCTS NORTH AMERICA, INC., a Maryland corporation, f/k/a Amoco Oil Company, ("**BP**") and Adnan Enterprises, LLC, a Florida limited liability company, ("**Adnan**"), dated November 12, 2007 (the "**Deed Restriction**"). *See* Deed Restriction attached as **Exhibit 1**.

10. The Deed Restriction does not require the Property to operate as a gas station, but if the Property is operated as a gas station, then it must be a "Grantor Branded Service Station," which the Deed specifically defines as a "motor fuel sales facility operating under the brand BP, Amoco, Arco, or any other brand of Grantor or any of its affiliates or their respective successors and assigns." *See* Ex. 1 at Ex. B, § I.

11. The Deed Restriction does not otherwise mention, reference, identify or define any branding requirements or brand standards that must be complied with, beyond the express definition of "Grantor Branded Service Station" quoted above.

12. Marathon claims to have subsequently acquired those Grantor rights under the Deed Restriction as a successor and assign.

13. In the petroleum industry, these types of restrictive covenants are understood to require the gas station to exclusively sell the branded company's fuel.

14. Thus, in this case, it would be commonly understood that the requirement to operate the Property as a "Grantor branded service station" would require the Property to sell Marathon-branded fuel.

15. Prior to Investment Corp's purchase of the Property, the Property had been continuously operating as a Marathon gas station, for at least several years, by selling Marathon-branded fuel under the Marathon name and customary Marathon signage.

16. The purpose of Investment Corp's purchase of the Property was to operate it as a Marathon gas station by continuing to sell Marathon-branded fuel under the Marathon name and Marathon signage.

17. Separate from restrictive covenants in deeds, many gas stations are also subject to supply agreements, which are contracts with the gas station's property owner that contain extensive and specific requirements on how the gas station must operate.

18. In addition, it is possible for gas stations to be operated as a franchise, which also involves contracts with the gas station's property owner that contain extensive and specific requirements on how the gas station must operate.

19. Supply agreements with gas stations in the petroleum industry, including supply

agreements with Marathon gas stations, can often be long term contracts that last many years.

20. Supply agreements with gas stations in the petroleum industry, including supply agreements with Marathon gas stations, often include the specific requirement that the gas station must operate on a particular credit card processing network that is dictated by the petroleum refining company—*i.e.*, the branded company, such as Marathon.

21. When a gas station operates on the branded company's credit card processing network, including Marathon's credit card processing network, the gas station must pay whatever credit processing fees the branded company imposes on the gas station.

22. However, the Property has not been subject to any supply agreement at any time since prior to 2022.

23. A primary reason that Investment Corp agreed to purchase the Property and operate it as a Marathon-branded gas station is because there was no supply agreement in place for the Property.

24. Indeed, the purchase contract contained the following specific term: "Seller represents there is no supply agreement with regard to the subject premises. This representation shall survive the closing."

25. Other than the Deed Restriction from 2007, Investment Corp has never entered into or been subject to any contract or agreement with Marathon as to how it must operate the Property.

26. Marathon's credit card processing network (the "**Marathon Heartland Network**") is operated by Heartland Payment Systems, Inc. ("**Heartland**").

27. Supply agreement with Marathon contain the specific requirement that the gas station must operate on the Marathon Heartland Network.

28. Marathon imposes on every gas station that operates on the Marathon Heartland

Network the particular credit card fees that the gas stations must pay.

29. Marathon generates significant revenue and profit from credit card fees on the Marathon Heartland Network.

30. Since Investment Corp purchased the Property in July 2022, Investment Corp has used the same credit card processing company that Marathon uses—Heartland—to operate on a credit card processing network that is also operated by Heartland (the "**Heartland Network**").

31. Investment Corp has paid substantially lower credit card fees on the Heartland Network than Investment Corp would have been required to pay if Investment Corp had operated on the Marathon Heartland Network.

32. Because Heartland is the same company that operates both the Marathon Heartland Network and the Heartland Network, Heartland could be capable of processing the same credit cards and payment options on the Heartland Network that are processed on the Marathon Heartland Network.

33. In addition, Heartland is capable of installing a separate credit card processing terminal in a gas station that operates on the Marathon Heartland Network that can be used to process proprietary Marathon cards, such as Marathon rebate and gift cards, even where the other credit card terminals in the same gas station do not operate on the Marathon Heartland Network.

34. By not joining the Marathon Heartland Network, and by negotiating with a company such as Heartland for lower credit card fees, a gas station such as Investment Corp can save many thousands of dollars annually in credit card processing and other fees.

35. In addition, from the ordinary consumers' perspective, the Heartland Network functions in substantially the same manner as the Marathon Heartland Network, and any differences would generally be perceived as minor and insignificant.

36. In fact, Marathon has not had or offered any Marathon credit cards since in or about 2019. All Marathon credit cards were discontinued prior to 2022. Therefore, since 2022, there have not been any consumers who have used Marathon credit cards.

37. From July 2022 through mid-September 2022, Investment Corp was continuously operating the Property as a Marathon gas station by exclusively selling Marathon-branded fuel, and was also displaying the Marathon name, colors, and trademarks at the Property.

38. The Marathon-branded fuel was supplied to the Property primarily by Pro Energy, LLC ("**Pro Energy**"), a distributor of fuel, or "jobber."

39. The only way that Investment Corp is able to buy Marathon-branded fuel is through jobbers, such as Pro Energy.

**B.    Marathon Prohibits Investment Corp From Purchasing Marathon Fuel.**

40. At all times since Investment Corp purchased the Property, Pro Energy has been ready, willing, and able to sell Marathon-branded fuel to Investment Corp at the Property, except when prohibited from doing so by Marathon.

41. In August 2022, Marathon began threatening to prohibit Pro Energy from supplying and selling Marathon gas to Investment Corp because Investment Corp was not processing credit card transactions on the Marathon Heartland Network.

42. On August 22, 2022, Investment Corp delivered a letter to Marathon to clarify that Investment Corp's obligation under the Restrictive Covenant was to sell Marathon-branded fuel at the Property under the Marathon name, which is what Investment Corp intended to continue doing.

43. On September 11, 2022, Pro Energy notified Investment Corp of Marathon's written and verbal communications to Pro Energy that, pursuant to Pro Energy's separate agreement with Marathon (the "**PSA**"), Marathon had decided it would, beginning immediately,

prohibit Pro Energy from continuing to supply and sell Marathon-branded fuel to the Property because the Property was not processing credit cards on the Marathon Heartland Network.

44. On September 12, 2022, Investment Corp again communicated to Marathon that Investment Corp is not a party to the PSA between Marathon and Pro Energy, that Investment Corp is complying with its obligation to operate the Property as a Marathon gas station by exclusively selling Marathon-branded fuel under Marathon's name, and that Marathon's prohibition would make it impossible for Investment Corp to purchase Marathon-branded fuel, thereby forcing Investment Corp to either sell non-Marathon fuel or to cease operating entirely.

45. At all times, Investment Corp communicated its intent and desire to sell Marathon-branded fuel at the Property in conformance with the Deed Restriction.

46. Despite Investment Corp's attempts to cooperate with Marathon to find a mutually-agreeable resolution that would permit Investment Corp to continue operating as a Marathon-branded gas station that sells Marathon-branded fuel, Marathon refused to entertain any compromise and instead demanded that Investment Corp join the Marathon Heartland Network and pay Marathon's unilaterally-imposed higher credit card fees, even though there is no requirement that Investment Corp do so in the Deed Restriction, and there is no contract or agreement with Investment Corp that imposes such a requirement.

C. **Investment Corp is Forced to De-Brand and Sell Non-Marathon Fuel.**

47. Since September 11, 2022, it has been impossible for Investment Corp to purchase Marathon-branded fuel for the Property due to Marathon's prohibition against distributors supplying Marathon-branded fuel to the Property.

48. As a result, after Marathon prohibited distributors from supplying Marathon-branded fuel to the Property on September 11, 2022, Investment Corp ran out of Marathon-branded

fuel within a few days in mid-September 2022.

49. At the time of Marathon's decision on September 11, 2022, it would have been impossible for Investment Corp to continue operating as a Marathon gas station by selling Marathon-branded fuel, even if Investment Corp had been willing to immediately join the Marathon Heartland Network on September 11, 2022, because the process for joining the Marathon Heartland Network can take several weeks.

50. Therefore, by mid-September 2022, Investment Corp was forced to either cease operating the Property as a gas station, thereby losing its ability to protect its investment, its employees and customer goodwill, or to remove the Marathon branding and sell non-Marathon fuel.

51. Immediately upon running out of Marathon-branded fuel in mid-September 2022, Investment Corp completely removed the Marathon name and signs from the Property and sold only non-Marathon fuel without operating under any name or signs. Since that time, Investment Corp has never operated the Property under any name or signs whatsoever, so the Property is not associated with any different or competing brands. Investment Corp's intention at that time was to operate the Property as an unbranded, non-Marathon gas station, with no affiliation with Marathon or any other different or competing brand, while simultaneously working with Marathon to try to convert the Property back to a Marathon gas station by selling Marathon-branded fuel as soon as Marathon would allow Investment Corp to do so.

52. Continuing to operate as a non-Marathon gas station on an interim basis not only benefits Investment Corp, but also Marathon, including because if the Property ceases operation completely and later re-opens as a Marathon gas station, which Investment Corp is still in the process of trying to accomplish, then many of its customers may never return, hence damaging the

long term revenue of both Marathon and Investment Corp.

53. Ultimately, the reason the Property stopped operating as a Marathon-branded gas station and selling Marathon-branded fuel is because Marathon refused to allow jobbers to sell Marathon-branded fuel to the Property. Absent Marathon's prohibition, Investment Corp would have continued to purchase Marathon-branded fuel through Pro Energy, who would have continued supplying Marathon-branded fuel to the Property, and Investment Corp would have continued to operate the Property as a Marathon gas station by selling Marathon-branded fuel to consumers.

54. Instead of deciding to forbid Investment Corp from purchasing Marathon-branded fuel, Marathon instead could have decided to allow Investment Corp to continue buying and selling Marathon-branded fuel while simultaneously seeking a court order requiring Investment Corp to join the Marathon Heartland Network and operate as a Marathon-branded gas station under Marathon's alternative interpretation of the Deed Restriction. But Marathon instead chose, on September 11, 2022, to prevent Investment Corp from buying any Marathon-branded fuel, effective immediately, until Investment Corp was operating on the Marathon Heartland Network.

**D.    Investment Corp Promptly Files this Lawsuit to Obtain a Judicial Ruling.**

55. On September 19, 2022—just eight days after Marathon made its decision to prevent Investment Corp from buying Marathon-branded fuel, and just a few days after running out of Marathon-branded fuel—Investment Corp filed a one-count Complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2022-CA-018071-CA-01, seeking a declaratory judgment as to whether Investment Corp was required to join the Marathon Heartland Network. Investment Corp's intention was to obtain a swift judicial ruling as to whether or not the Deed Restriction requires Investment Corp to operate on the Marathon

9

Heartland Network in order to buy Marathon-branded fuel, so that, regardless of the ruling, Investment Corp could resume buying and selling Marathon-branded fuel and operating as a Marathon gas station—*i.e.*, whether or not the Court also required Investment Corp to join the Marathon Heartland Network.

56. Marathon subsequently removed the case to federal court and asserted numerous counterclaims. Some of those claims are for trademark infringement against Investment Corp based on the use of blue and red striping on the Property's canopy. Marathon only made those claims through the course of this litigation in public court filings, and never raised those issues or claims with Investment Corp directly.

57. Investment Corp was surprised to learn that Marathon was claiming trademark infringement based on blue and red striping on the canopy. Marathon is not the only branded gas station company to use blue or red striping on gas station canopies. And Investment Corp had already removed all Marathon names and signs on the Property immediately upon running out of Marathon-branded fuel in mid-September 2022.

58. Upon learning of Marathon's trademark infringement claims in or about October 2022, Investment Corp immediately removed all blue and red coloring from the Property by painting the entire exterior of the building white, including the canopy. Since that time, the Property has not contained any colors or trademarks associated with the Marathon brand. In addition, since running out of Marathon-branded fuel in mid-September 2022, the Property has not contained the Marathon name or any Marathon signs, and Investment Corp has not represented to anyone, including its customers, that the Property is a Marathon gas station or that it sells Marathon-branded fuel.

59. By November 2022, Marathon was still refusing to permit Investment Corp to

purchase Marathon-branded fuel, and no judicial determination had been made. Accordingly, on November 9, 2022, Investment Corp submitted a written request to Pro Energy stating that it "would like to start processing under Marathon[']s credit card network and get Marathon branded Fuel ASAP at [the Property.] Please find out with Marathon how quickly we can get this done." Immediately that same day, Pro Energy forwarded the request to Marathon, requesting that it "get the ball rolling ASAP."

60. In response, in mid-November 2022, Marathon informed Investment Corp, for the first time, that if it operates on the Marathon Heartland Network, then all of its credit card transactions at the Property must be deposited into a jobber's account and not into Investment Corp's account directly. Marathon stated that all "existing dealers" are allowed to receive credit card transactions directly into their own account, but that "new dealers" may only be paid indirectly through jobbers. Being paid indirectly through jobbers would mean that the gas station dealer, such as Investment Corp, does not receive the payments for its credit card transactions for a longer period of time—at least several days, and likely more than one week, after each transaction occurs—thereby creating unnecessary delays and cash-flow issues in receiving payment for completed transactions.

61. Investment Corp immediately requested permission from Marathon to receive credit card deposits directly into its own account, including on the basis that it is not a "new dealer," but Marathon responded stating that it is not an option to receive credit card deposits directly into its own account. Marathon later changed its position and agreed to allow Investment Corp to receive credit card deposits directly into its own account, but only on a temporary basis during this litigation.

62. In late November 2022, Investment Corp completed and submitted the necessary

paperwork to operate as a Marathon gas station.

63. Since November 2022, Investment Corp has been ready and willing to join the Marathon Heartland Network—pending a determination from the Court on whether it needs to permanently remain on the Marathon Heartland Network—and to operate as a Marathon gas station. Since November 2022, Investment Corp has been waiting to be permitted by Marathon to buy and sell Marathon-branded fuel, to join the Marathon Heartland Network, and to display Marathon's name, signs and trademarks.

## COUNT I – DECLARATORY RELIEF

64. Investment Corp reincorporates paragraphs 1-63 above as if originally set forth herein.

65. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, this Court has jurisdiction to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed.

66. The Deed Restriction requires Investment Corp to operate the Property as a "Grantor branded service station," which it defines as a "motor fuel sales facility operating under the brand [Marathon]." However, the Deed Restriction does not otherwise mention, reference, identify or define any branding requirements or brand standards that must be complied with. In particular, the plain language of the Deed Restriction does not require, or even suggest, that the Property must operate on any particular credit card network.

67. Marathon is taking the position that Deed Restriction requires Investment Corp to operate on the Marathon Heartland Network.

68. Marathon is also using its contractual relationships with jobbers to prevent Investment Corp from purchasing Marathon-branded fuel unless Investment Corp operates on the Marathon Heartland Network.

69. Investment Corp is in doubt as to the enforceability of the Deed Restriction because Marathon is frustrating the purpose of the Deed Restriction—to operate the Property as a Marathon gas station—by imposing additional requirements on Investment Corp outside the scope of the Deed Restriction and by prohibiting any Marathon-branded fuel to be supplied to the Property if Investment Corp does not comply with those requirements.

70. Marathon's actions are preventing Investment Corp from complying with the Deed Restriction because Investment Corp cannot obtain Marathon-branded fuel without Marathon's authorization, which Marathon will not provide unless Investment Corp complies with whatever unilateral requirements Marathon wishes to impose.

71. If the Deed Restriction is enforceable, Investment Corp is in doubt as to its rights of control and operation of the Property under the Deed Restriction and seeks a declaration of its rights thereto.

72. In particular, Investment Corp seeks a declaration that the Deed Restriction does not require the Property to operate on the Marathon Heartland Network because it is outside the scope of the Deed Restriction.

73. To ensure the meaning and enforceability of such declaration, and to prevent Marathon from frustrating the purpose of the Deed Restriction, Investment Corp also seeks a declaration that Marathon may not prevent jobbers from selling Marathon-branded fuel to the Property on the basis that the Property is not operating on the Marathon Heartland Network.

74. In addition, Investment Corp seeks a declaration that the Deed Restriction does not require credit card deposits for transactions made at the Property to be paid into jobber accounts rather than into Investment Corp's account, and that Marathon may not unilaterally impose such a requirement that is outside the scope of the Deed Restriction.

QB\77467997.4

75. Investment Corp has an actual, immediate, adverse, and antagonistic interest in the subject matter and is thus in need of a declaration as to the parties respective rights and obligations pursuant to 28 U.S.C. § 2201. The antagonistic and adverse interests are all before the Court by proper process.

76. The relief sought herein is not mere legal advice, or the answer to questions propounded for curiosity.

WHEREFORE, Investment Corp requests that the Court enter a declaratory judgment declaring that the Deed Restriction is unenforceable, and therefore null and void, due to Marathon prohibiting Investment Corp from obtaining Marathon fuel. In the alternative, if the Court determines that the Deed Restriction is enforceable, Investment Corp seeks a declaratory judgment that: (1) the Deed Restriction does not require the Property to operate on the Marathon Heartland Network, and that Marathon may not prevent jobbers from selling Marathon-branded fuel to the Property on the basis that the Property is not operating on the Marathon Heartland Network; and (2) the Deed Restriction does not require credit card deposits for transactions made at the Property to be paid into jobber accounts rather than into Investment Corp's account, and that Marathon may not unilaterally impose such a requirement. Investment Corp also requests that the Court award Investment Corp its costs incurred in this action and award such other relief, including supplemental relief and damages, as the Court deems proper.

### COUNT II – VIOLATION OF THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.S.C. § 2801 ET. SEQ.

77. Investment Corp reincorporates paragraphs 1-63 above as if originally set forth herein.

78. Marathon is a "franchisor" as that term is defined under the PMPA, 15 U.S.C. § 2801 et seq., because Marathon is a refiner that authorizes a retailer to use a trademark in

connection with the sale of motor fuel. 15 U.S.C. § 2801(3), (5).

79. Investment Corp is a "franchisee" as that term is defined under the PMPA because it is a retailer that is authorized to use a trademark in connection with the sale of motor fuel. 15 U.S.C. § 2801(4).

80. The relationship between Investment Corp and Marathon pursuant to the Deed Restriction is a "franchise" as that term is defined under the PMPA because it is an agreement under which a refiner authorizes a retailer to use, in connection with the sale of motor fuel, a trademark which is owned or controlled by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. 15 U.S.C. § 2801(1)(A)(iv).

81. The relationship between Investment Corp and Marathon is a "franchise relationship" as that term is defined under the PMPA because it deals with the respective motor fuel marketing or distribution obligations and responsibilities of a refiner and a retailer which result from the marketing and distribution of motor fuel. 15 U.S.C. § 2801(2).

82. Under the PMPA, a notification of termination or nonrenewal of a franchise relationship is only valid if the requirements under 15 U.S.C. § 2804 are met and "such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3). 15 U.S.C. § 2802(b)(1)(A)-(B).

83. 15 U.S.C. § 2804 requires that a notice of termination of a franchise: (1) shall be furnished to the franchisee not less than 90 days prior to the date on which such termination or nonrenewal takes effect; (2) shall be in writing; (3) shall be posted by certified mail or personally delivered to the franchisee; and (4) shall include a statement of intention to terminate the franchise, together with the reasons therefor; the date on which such termination takes effect; and a summary statement summarizing the franchisee's rights under the PMPA which is prepared by the Secretary

of Energy and published in the Federal Register. 15 U.S.C. § 2804(a), (c)-(d).

84. Marathon has not complied with the requirements of the PMPA for a notice of termination of a franchise. Specifically, Marathon did not furnish to Investment Corp, not less than 90 days prior to the date on which termination of the franchise took effect, a written notice, posted by certified mail or personally delivered to Investment Corp, and containing: (1) a statement of intent to terminate the franchise, together with reasons therefor; (2) the date on which such termination takes effect; and (3) a statement summarizing Investment Corp's rights under the PMPA.

85. In or about September 2022, Marathon informed Pro Energy that the Property is not an approved Marathon location and that Pro Energy is not authorized to supply Marathon-branded fuel to the Property.

86. None of the grounds for termination outlined in 15 U.S.C § 2802(b) apply.

87. Marathon's conduct was in willful violation of the requirements of 15 U.S.C. § 2802 and in willful violation of Investment Corp's rights thereunder.

88. In any action arising from a franchisor's failure to comply with the requirements of 15 U.S.C § 2802, "the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 . . . of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

89. Based upon Marathon's aforementioned conduct, Investment Corp has suffered damages.

WHEREFORE, Investment Corp demands judgment against Marathon as follows:

(a) actual damages, pursuant to the PMPA, 15 U.S.C. § 2805(d)(1)(a);

(b) exemplary damages, pursuant to the PMPA, 15 U.S.C. § 2805(d)(1)(b);

(c) attorneys' fees and expert witness fees, pursuant to the PMPA, 15 U.S.C. § 2805(d)(1)(c);

(d) costs of suit; and

(e) all such further relief as the Court deems just and proper.

### COUNT III – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

90. Investment Corp reincorporates paragraphs 1-63 above as if originally set forth herein.

91. During all relevant times, Investment Corp has had a business relationship with Pro Energy whereby Pro Energy will supply Investment Corp with Marathon-branded fuel.

92. Marathon was directly and/or indirectly aware of the terms and scope of Investment Corp's business relationship with Pro Energy, including because Pro Energy was supplying Marathon-branded fuel to Investment Corp.

93. In or about September 2022, Marathon informed Pro Energy that the Property is not an approved Marathon location and that Pro Energy is not authorized to supply Marathon-branded fuel to the Property because it is not operating on the Marathon Heartland Network.

94. Since September 11, 2022, Marathon has prevented Pro Energy from supplying fuel to the Property, unless and until such time that the Property is operating on the Marathon Heartland Network.

95. On or about September 11, 2022, Pro Energy ceased selling Marathon-branded fuel to Investment Corp because Marathon prohibited Pro Energy from continuing to do so.

96. Since September 11, 2022, Investment Corp has been completely unable to purchase Marathon-branded fuel due to Marathon's actions.

97. At all relevant times, Investment Corp has communicated to Marathon and Pro Energy its intent and desire to purchase Marathon-branded fuel from Pro Energy and sell Marathon-branded fuel at the Property.

98. Further, joining the Marathon Heartland Network can take several weeks, and Marathon did not provide Investment Corp with sufficient time or opportunity to join the Marathon Heartland Network before cutting off Investment Corp's ability to purchase Marathon-branded fuel.

99. Marathon knowingly, intentionally, and unjustifiably interfered with Investment Corp's business relationship with Pro Energy by forcing Pro Energy to terminate its agreement with Investment Corp to supply Marathon-branded fuel to the Property. Marathon's interference was improper in means and motive.

100. Marathon's improper interference with Investment Corp's and Pro Energy's business relationship caused Investment Corp damages, injuries and expenses, including suddenly having to de-brand the Property and purchase alternative non-Marathon fuel in order to avoid shutting down its business.

101. As a direct, proximate, and foreseeable result of Marathon's tortious interference with the business relationship between Investment Corp and Pro Energy, Investment Corp has suffered substantial damages.

WHEREFORE, Investment Corp respectfully requests that this Honorable Court enter a judgment in its favor and against Marathon, for: (i) actual and compensatory damages in an amount to be determined at trial; (ii) attorneys' fees, costs and pre- and post-judgment interest; and (iii) such other and further relief as this Honorable Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Investment Corp demands a jury trial on all issues so triable.

QUARLES & BRADY LLP

By: */s/ Joseph T. Kohn*
Joseph T. Kohn
Florida Bar No. 113869
Gabriela N. Timis
Florida Bar No. 1025730
1395 Panther Lane, Suite 300
Naples, FL 34109
239/659-5026 Telephone
239/213-5426 Facsimile
joseph.kohn@quarles.com
gabriela.timis@quarles.com
debra.topping@quarles.com
kerlyne.luc@quarles.com
DocketFL@quarles.com
*Co-Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on February 1, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/Joseph T. Kohn*
Joseph T. Kohn

QB\77467997.4